# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 14 2018, 7:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew R. Falk
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lee M. Stoy, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kochelle Stumpf, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 14, 2018 <br><br> Court of Appeals Case No. <br> 32A05-1712-CR-2940 <br><br> Appeal from the Hendricks <br> Superior Court <br><br> The Honorable Stephenie LeMay-Luken, Judge <br><br> Trial Court Cause No. <br> 32D05-1609-F5-117 |

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Defendant, Kochelle Stumpf (Stumpf), appeals her conviction for battery, a Level 5 felony, Ind. Code § 35-42-2-1(c)(1).

[2] We affirm.

# ISSUE

[3] Stumpf presents this court with one issue on appeal, which we restate as: Whether the State presented sufficient evidence to sustain Stumpf's conviction for battery beyond a reasonable doubt.

# FACTS AND PROCEDURAL HISTORY

[4] On September 6, 2016, Madison Wyland collected her ten-month-old daughter, K.P., at ABC Childcare, located in Plainfield, Indiana. When Wyland changed her daughter's clothes later that day, she noticed scratches and nail marks underneath the child's arms. The following day, Wyland contacted the owner of ABC Childcare, Tamela Hunt-Stephey (Stephey), to complain about her daughter's injuries and requested Stephey to review the surveillance footage. Upon talking with the daycare workers, Wyland took her daughter to the Plainfield Police Department to report the scratches and nail marks. Detective Alison Riter (Detective Riter) was assigned to the investigation and went to ABC Childcare to speak with the daycare workers and Stephey.

[5] When Detective Riter arrived at ABC Childcare, she was shown surveillance video footage of three different children, K.P., E.B., and J.P-R., who were all

being supervised by the same daycare worker, Stumpf. Stumpf typically takes care of children between the ages of three and five-years-old. However, toward the end of the day on September 6, 2017, Stumpf was asked to relieve another teacher and to cover a room with children between the ages of infant and three-year-old. The first video excerpt, State's Exh. A-IMG 2054, depicts Stumpf as the main caregiver in the room, with an assistant sitting on a chair in the back of the room. Stumpf is changing children's diapers at the changing station with several children sitting nearby. At a certain point, Stumpf walks to the back of the room, and when she returns towards the changing station, she grabs two children—who were seemingly underneath the changing table—one of which is two-year-old E.B. As she turns around and has her back to the surveillance camera, she appears to toss E.B. to the ground. During this entire encounter, the assistant, who was new and shadowing Stumpf, never left her chair nor helped Stumpf.

[6] The second surveillance video excerpt, State's Exh. A-IMG 2055, shows Stumpf putting a sweatshirt and shoes on eleven-month-old, J.P-R. She takes J.P-R out of the high chair and places him on the edge of a table. While Stumpf is putting on his shoes, she twice pulls her arm away when J.P-R tries to grab it to balance himself. She eventually forces J.P-R to lay down on the table by pushing him down by the chest.

[7] In the third surveillance video excerpt, State's Exh. A-IMG 2056, Stumpf takes K.P. out of a playpen and places her in a bouncy chair. She grabs K.P.'s bottle and, when she returns to the bouncy chair, aggressively pushes K.P. back into

the bouncy chair by pushing K.P.'s forehead, and forces the bottle into K.P.'s mouth.

[8] On September 29, 2016, the State filed an Information, charging Stumpf with three Counts of battery, Level 5 felonies. On September 11 and 12, 2017, the trial court conducted a jury trial. At the close of the evidence, the jury found Stumpf guilty of battery involving E.B., and not guilty in the incidents involving J.P-R and K.P. On November 15, 2018, the trial court held a sentencing hearing and sentenced Stumpf to an executed sentence of 730 days, with 729 days suspended to probation.

[9] Stumpf now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[10] Stumpf contends that the State failed to present sufficient evidence to support her conviction for battery beyond a reasonable doubt. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh the evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1005, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*. The evidence need not be so overwhelming as to overcome every reasonable hypothesis of innocence. *Drane v. Scott*, 867 N.E.2d 144, 147 (Ind. 2007). The jury, as the trier of fact, is

entitled to determine which version of the incident to credit and is the sole judge of the effect that any discrepancies or contradictions might have on the outcome of the case. *Scott v. State*, 867 N.E.2d 690, 695 (Ind. Ct. App. 2007), *trans. denied*; *Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002).

[11] To convict Stumpf of battery as a Level 5 felony, the State was required to establish that Stumpf, a person of at least eighteen years of age, knowingly or intentionally touched E.B., who was younger than fourteen years of age, in a rude, insolent, or angry manner, which resulted in bodily injury. *See* I.C. § 35-42-2-1. Stumpf's argument contesting her conviction is two-fold: (1) she did not touch E.B. in a rude, insolent, or angry manner; and (2) she did not cause E.B.'s injury. We will address each contention in turn.

### I. *Rude, Insolent, or Angry Manner*

[12] Focusing on the lack of witnesses, Stumpf claims that "[t]he only testimony regarding [her] manner came from those who watched the video without any audio and who only saw the video at two-times the actual speed, which looked worse than it would in real time." (Appellant's Br. p. 12). She references, among others, E.B.'s father's testimony on cross-examination who, after viewing the surveillance video twice, admitted that he could not tell whether E.B. "tripped over the little blonde girl's feet[.]" (Transcript Vol. II, p. 255).

[13] Resolution of this issue turns, in part, on the interpretation of the video evidence in this case. When reviewing video evidence, "we give the trial court's decision great deference." *Love v. State*, 73 N.E.3d 693, 698 (Ind. 2017).

But in those instances, where the video evidence indisputably contradicts the trial court's findings, relying on such evidence and reversing the trial court's findings does not constitute reweighing. To be clear, in order that the video evidence indisputably contradicts the trial court's findings, it must be such that no reasonable person could view the video and conclude otherwise. When determining whether the video evidence is indisputable, a court should assess the video quality including whether the video is grainy or otherwise obscured, the lighting, the angle, the audio and whether the video is a complete depiction of the events at issue, among other things. In cases where the video evidence is somehow not clear or complete or is subject to different interpretation, we defer to the trial court's interpretation.

*Id.* at 699-700.

[14] The surveillance video submitted into evidence as State's Exhibit A-IMG 2054 was clear and had proper lighting, but lacked audio and was taken at such an angle that made the events difficult to see. Because Stumpf had her back turned towards the camera and held the children in front of her, we only discern the end result, *i.e.,* Stumpf tossing E.B. onto the floor. Furthermore, the jury, who viewed the surveillance video "anywhere between ten, twenty times" during trial and again during their deliberations, was well aware of the speed of the video. (Tr. Vol. III, p. 114).

[15] In addition to the video evidence, the jury saw and heard Stumpf testify that on September 6, 2016, she was caring for ten toddlers and six infants, one of whom had a feeding tube. She was not getting the help that she was supposed to be receiving from her assistant. Although Stumpf denied being frustrated, she

explained that she had a lot to do during the time she was in that particular room, [c]hanging diapers, feeding bottles." (Tr. Vol. III, p. 21).

[16] Based on all the evidence before it, the jury could reasonably conclude that Stumpf touched E.B. in a rude, angry or insolent manner. This is not a case where the video evidence indisputably contradicts the testimony deduced at trial. As such, we decline to reweigh the evidence and we defer to the trier of fact's conclusion.

## II. *E.B.'s Injury*

[17] Next, Stumpf challenges the jury's conclusion that she caused E.B.'s bodily injury. She maintains that "[i]n the absence of any video evidence that [Stumpf] injured E.B., with no credible evidence that E.B. was injured at all until approximately 48 hours later, and with the reasonable possibility that E.B. was injured by his brother or in his mother's home at another time, a reasonable person could not have found beyond a reasonable doubt that [Stumpf] injured E.B." (Appellant's Br. p. 15).

[18] Again, Stumpf is asking us to invade the province of the jury and to reweigh the evidence and credibility of the witnesses. Nevertheless, looking at the evidence most favorable to the judgment, we note that the jury could reasonably have inferred from all the evidence before it that Stumpf was responsible for E.B.'s injury. First, the video evidence appears to indicate that E.B. fell with his head on the floor and bounced back up onto his arms, causing Detective Riter to testify at trial that E.B. "was hit [] and fell back[,] bounced his head off the

floor." (Tr. p. Vol. II, 159). Although E.B.'s mother did not initially observe any injuries on E.B., E.B.'s father discovered a "minor bruise" on E.B.'s head that was scabbed over the next day when he took E.B. to the barber and the barber noticed the knot and bruising. (Tr. Vol. II, p. 247). Although E.B.'s father offered an alternative explanation of E.B. being injured by his older brother at E.B.'s mother's house, the jury, as the trier of fact, is entitled to determine which version of the incident to credit. *See Scott*, 867 N.E.2d at 695. Accordingly, we find the evidence presented at trial was sufficient to sustain Stumpf's conviction for battery beyond a reasonable doubt.

# CONCLUSION

[19] Based on the foregoing, we conclude that the State presented sufficient evidence to support Stumpf's conviction for battery as a Level 5 felony beyond a reasonable doubt.

[20] Affirmed.

[21] May, J. and Mathias, J. concur